IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| Duane Joseph Johnson,<br>    Plaintiff, | )<br>)<br>) | |
| v. | )<br>) | 1:16cv1097 (CMH/TCB) &<br>1:17cv95 (CMH/JFA) |
| United States of America, et al.,<br>    Defendants. | )<br>) | |

MEMORANDUM OPINION

In these consolidated lawsuits, Duane Joseph Johnson, a federal inmate proceeding pro se, brings claims under the Federal Tort Claims Act (FTCA), 28 U.S.C §§ 1346(b), 2671–2680, and Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971). Johnson alleges that the United States and medical staff at Federal Correctional Institution Petersburg Medium (FCI Petersburg) treated his spinal disorder in a manner that violates Virginia tort law and the Eighth Amendment. The United States and individual defendants move to dismiss and for summary judgment. [Dkt. Nos. 54–55]. Johnson received the notice required by Local Rule 7(K) and Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975). [Dkt. No. 56]. Johnson opposes the defendants' motion and also moves for appointment of counsel and an expert.[1] [Dkt. Nos. 62–64]. For the reasons that follow, the FTCA claims will be dismissed, summary judgment will be granted to the individual defendants, and Johnson's motions for appointment of counsel and an expert will be denied.

---

[1] Before filing his motion opposing the defendants' motion to dismiss and for summary judgment, Johnson moved to exceed the page limit in Local Rule 7(F). [Dkt. No. 61]. Additionally, the defendants moved for an extension of time to respond to Johnson's opposition motion and motion to appoint an expert. [Dkt. Nos. 66–67]. The Court will grant these motions *nunc pro tunc* and deem each submission timely and appropriately filed.

## I. Background

Johnson complains of spine-related nerve pain, for which he has sought medical treatment during his tenure at FCI Petersburg. In these lawsuits, he brings four claims under the FTCA: two for medical malpractice, one for negligence, and one for intentional infliction of emotional distress. He also claims that numerous members (or former members) of FCI Petersburg medical staff are liable under Bivens for acting with deliberate indifference to his serious medical need. He filed these lawsuits on July 19, 2016 (Bivens and FTCA claims) and January 14, 2017 (FTCA claim), and he challenges conduct dating back to 2005. The following facts are undisputed, except where noted, and outline Johnson's medical care at FCI Petersburg as it pertains to his FTCA and Bivens claims. The Court views the facts in the light most favorable to Johnson as the nonmoving party, and it draws all reasonable inferences in his favor. See Bennett v. Garner, 913 F.3d 436, 438 (4th Cir. 2019).

Johnson says that since his arrival at FCI Petersburg in November 2005, he consistently complained to medical staff about his spine-related pain, either in person or through written sick-call requests. [Dkt. No. 1, Pl.'s Verified Compl. ¶¶ 21–23; Dkt. No. 64-2, Johnson Decl. ¶ 8]. In particular, Johnson attests that "over the years" he would complain to Dr. Benjamin Rice, Physician Assistant (PA-C) Ignatius Hall, and Mid-level Practitioner (MLP) Bhagya Katta about his spine pain, but the physicians would tell him only to stretch and drink water. [Dkt. No. 64-2, Johnson Decl. ¶¶ 23, 28–29]. He further declares that, at some point, he asked Dr. Suhasini Shah for a cane, walker, or wheelchair because the pain shooting into his hands and feet made walking difficult. [Id. ¶ 27].

The defendants dispute Johnson's contention that he was ignored for years, pointing to medical records from 2008 through 2016, which, in their view, demonstrate that Johnson "visited

with a virtually uncountable number of health care professionals . . . on nearly seventy (70) occasions in order to receive treatment" for his spinal disorders. [Doc. No. 55, Defs.' Mem. of Law ¶ 2]. First, they point to medical records from May 11, 2009, showing that Johnson complained to PA-C Hall about left shoulder pain stemming from a 2002 exercise injury. [Dkt. No. 55-4, Def. Ex. D at 13]. Hall ordered a shoulder x-ray, which was taken and reviewed by August 6, 2009. [Id. at 7, 14]. The reviewing physician, MLP Andarge Yirga (not named as a defendant), saw no abnormality in the x-ray, noted that Johnson reported chronic left shoulder pain radiating from his neck down into his upper left arm, and instructed Johnson to take over-the-counter pain medication. [Id. at 7–8]. By the end of September, as Johnson continued to experience pain, MLP Katta ordered cervical spine x-rays. [Id. at 3–4]. These x-rays revealed mild degenerative disc disease at the C4–C5 vertebrae. [Id. at 37].

Johnson continued to report pain, and in July 2010 MLP Yirga recommended that Johnson see an outside orthopedist. [Dkt. No. 55-5, Def. Ex. E at 20, 27–28]. Johnson was taken to see Dr. Karanvir Prakash, who recommended that an MRI be taken of Johnson's cervical spine. [Id. at 62]. An MRI was approved and then performed on August 26, 2010. [Id. at 61–62, 64]. The MRI revealed disc degeneration from the C2–C7 vertebrae, C-spine stenosis, and mild disc herniation to the left side of the C5–C6 vertebrae. [Id. at 59; Dkt. No. 55-6, Def. Ex. F at 147]. After a follow-up visit, Dr. Prakash recommended that Johnson see another specialist, Dr. Kalluri. [Dkt. No. 55-5, Def. Ex. E at 59].

Johnson was permitted to see Dr. Kalluri, who, after examining Johnson on November 15, 2010, recommended that Johnson receive cervical facet injections and take over-the-counter anti-inflammatory medication. [Id. at 50–51; Dkt. No. 55-6, Def. Ex. F at 147–49]. The prison approved the procedure. [Dkt. No. 55-5, Def. Ex. E at 47]. Dr. Nadeem Khan performed the

3

injections on February 10, 2011, and further recommended that Johnson take three medications: Neurontin (gabapentin), Lyrica (pregabalin), and naproxen (an over-the-counter anti-inflammatory).[2] [Dkt. No. 55-6, Def. Ex. F at 142–45]. The prison gave Johnson gabapentin and naproxen, not pregabalin, which is a non-formulary medication requiring approval to receive. [Id. at 40; Dkt. No. 55-15, Def. Ex. O at 5, 13].

Dr. Kahn performed another round of facet injections on August 5, 2011. [Dkt. No. 55-6, Def. Ex. F at 113–15]. The doctor's treatment records show that he recommended that Johnson discontinue taking gabapentin because it was causing him to gain weight. [Id. at 115]. Johnson attests that he also told Dr. Khan that the gabapentin caused him "extreme illness." [Dkt. No. 64-2, Johnson Decl. ¶ 16]. After this visit with Dr. Khan, MLP Yirga requested permission to prescribe pregabalin. [Dkt. No. 55-7, Def. Ex. G]. The Central Office Physician denied the request on the ground that Johnson had been only 50% compliant with taking gabapentin. [Id.]. Johnson admits that he was often noncompliant with taking his prescribed gabapentin, explaining that pain made it difficult to walk to, and wait in, the pill line three times a day and, when he did, the medication caused him to gain weight and feel ill. [Dkt. No. 64, Pl.'s Mem. of Law ¶¶ 12–13; Doc. 64-2, Johnson Decl. ¶ 15; Dkt. No. 55-6, Def. Ex. F at 3].

Johnson continued to seek treatment for his spine-related pain at FCI Petersburg, all the while maintaining admittedly poor compliance with his prescribed gabapentin regime. [Dkt. No. 54, Pl.'s Mem. of Law ¶¶ 13, 16; Dkt. No. 55-6, Def. Ex. F at 3; Dkt. No. 55-9, Def. Ex. I at 4–5]. From 2011 through 2015, he visited MLP Yirga and a contract physician, Dr. Salman Akbar, numerous times. [Dkt. No. 55-6, Def. Ex. F at 9–10; Dkt. No. 55-8, Def. Ex. H at 2–3, 6–8, 10–

---

[2] Throughout this Memorandum Opinion, the Court will refer to the generic names for the brand name medications Neurontin (generic = gabapentin) and Lyrica (generic = pregabalin).

4

13; Dkt. No. 55-9, Def. Ex. I at 9–15, 18–19; Dkt. No. 55-10, Def. Ex. J at 4–9, 11–12; Dkt. No. 55-11, Def. Ex. K at 1–6]. Johnson attests that he continuously complained to the physicians about pain from his spine condition, but the defendants have submitted medical records indicating that he occasionally reported being less symptomatic. [Compare Dkt. No. 64-2, Johnson Decl. ¶ 19, with Dkt. No. 55-6, Def. Ex. F at 9–10, and Dkt. No. 55-9, Def. Ex. I at 9–12]. Additionally, in early 2014, based on Johnson's recurring complaints of tingling and numbness in his fingers and decreased range of motion, MLP Yirga recommended that Johnson see another outside specialist; Dr. Katherine Laybourn approved the request, and the exam took place on September 26, 2014. [Dkt. No. 55-10, Def. Ex. J at 7–9, 36, 44]. The specialist, Dr. Dawen Bu, recommended that Johnson take gabapentin or pregabalin [Id. at 40].

In 2016, the prison's Clinical Director, Dr. Mark DiCocco, examined Johnson. [Dkt. No. 55-12, Def. Ex. L at 46–51]. He ordered that Johnson receive an updated MRI of his cervical spine and also submitted a new non-formulary prescription request for pregabalin. [Id. at 50; Dkt. No. 55-13, Def. Ex. M]. This time the Central Office Physician approved the request, overruling the recommendation of the Institutional Chief Pharmacist, who had proposed that Johnson try another formulary medication. [Dkt. No. 55-13, Def. Ex. M].

Johnson was transported to Federal Medical Center (FMC) Butner in North Carolina twice for an MRI, in June and July 2016. [Dkt. No. 55-12, Def. Ex. L at 102–03, Dkt. No. 55-14, Chatman Decl. ¶ 8; Dkt. No. 64-2, Johnson Decl. ¶ 30]. The MRI revealed spinal canal stenosis from vertebrae C5–C6 to C7–T1, which the radiologist described as "slightly worsened" since the last imaging. [Id. at 103].

Before the rides to and from North Carolina, Johnson attests that he asked Health Services Administrator (HSA) Allison Chatman to ensure that he would receive his medication

and walker before departing. [Dkt. No. 64-2, Johnson Decl. ¶ 30]. He says that she agreed to make arrangements for them, but he ultimately received neither. [Id. ¶ 32]. Wearing shackles inside the transport bus, without the benefit of pain medication, caused him great pain. [Id. ¶ 33]. After the first trip, Johnson filed the first of these two lawsuits on July 19, 2016.

## II. Motion to Dismiss

### A. FTCA Claims

Johnson's FTCA claims fault the government for delaying treatment, declining to prescribe medication recommended by a specialist, denying his requests for movement-assistance accessories (e.g., walker, wheelchair, cane), and, by withholding his medication and walker, needlessly inflicting pain during the vehicular transport to FMC Butner. The United States has moved to dismiss these claims.

### B. Standard of Review

The United States moves to dismiss the FTCA claims for failing to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6). However, because the viability of Johnson's FTCA claims invoke the Court's jurisdiction, this Court has an independent obligation to consider whether the FTCA claims should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1). See Fed. R. Civ. P. 12(h)(3); Brickwood Contractors, Inc. v. Datanet Eng'g, Inc., 369 F.3d 385, 390 (4th Cir. 2004) (en banc).

"A court's determination of subject matter jurisdiction addresses whether the court has the authority to entertain a particular kind of case." Upstate Forever v. Kinder Morgan Energy Partners, 887 F.3d 637, 646 (4th Cir. 2018). The FTCA grants jurisdiction to district courts to hear claims made

> [1] against the United States, [2] for money damages, ... [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act

or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

FDIC v. Meyer, 510 U.S. 471, 477 (1994) (quoting 28 U.S.C. § 1346(b)(1)) (alterations in original); see also Kerns v. United States, 585 F.3d 187, 194 (4th Cir. 2009).

**C. Analysis**

This Court's jurisdiction turns on the sixth element identified above: whether "the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." See 28 U.S.C. § 1346(b)(1). Here the alleged tortious conduct took place at FCI Petersburg, located in Virginia. If Johnson would be unable to pursue his tort claims in Virginia, this Court, in turn, would lack subject matter jurisdiction over his FTCA claims. See Williams v. United States, 242 F.3d 169, 172 (4th Cir. 2001); James v. United States, 143 F. Supp. 3d 392, 396–97 (E.D. Va. 2015).

The United States argues that Johnson's FTCA claims warrant dismissal because he failed to obtain an expert witness attesting that the United States' actions "deviated from the applicable standard of care and the deviation was a proximate cause of the injuries claimed," as Virginia requires for medical malpractice claims. See VA. CODE ANN. § 8.01-20.1. Johnson concedes that the certification requirement applies to the types of tort claims he brings under the FTCA. He insists, however, that his allegations fall under the exception for claims in which "the alleged act of negligence clearly lies within the range of the jury's common knowledge and experience." Id.

The common knowledge exception does not apply here. Only in "rare" circumstances is an expert unnecessary "to establish the appropriate standard of care, a deviation from that standard, and that such a deviation was the proximate cause of damages" in a medical

7

malpractice claim. Beverly Enterprises-Virginia, Inc. v. Nichols, 441 S.E.2d 1, 3 (Va. 1994); see Parker v. United States, 475 F. Supp. 2d 594, 597 (E.D. Va. 2007). For instance, an expert is not needed to tell a jury whether a surgeon committed medical malpractice by inadvertently leaving a foreign object inside a patient. See James, 143 F. Supp. 3d at 396; Coston v. Bio-Medical Applications of Va., Inc., 654 S.E.2d 560, 562 (Va. 2008).

Here, Johnson's allegations do not obviate the need for expert testimony. According to Johnson, the defendants' "refusal to diagnose and treat [his] pain and suffering for many years and to adhere to their own spinal specialist orders to treat [his] spinal nerve pain with Lyrica [pregabalin] does not require an expert." [Dkt. No. 64, Pl.'s Mem. of Law at 21]. However, the record is replete with undisputed evidence contradicting Johnson's assertion that he was denied medical treatment at FCI Petersburg. See In re KBR, Inc., Burn Pit Litig., 744 F.3d 326, 333 (4th Cir. 2014) (explaining that district court may consider materials outside pleadings when considering whether to dismiss claim for lack of subject matter jurisdiction). For instance, Johnson received multiple x-rays and MRIs, was taken to see several outside specialists, received multiple rounds of cervical facet injections, and was prescribed pain medication, albeit not the one he wanted.

So what Johnson really seeks to litigate is the prison physicians' treatment decisions and the rapidity with which they were made. Indeed, Johnson principally asserts that the United States (1) delayed diagnostic procedures and prescribing particular pain medication, (2) failed to follow treatment options recommended by a specialist, and (3) provided inadequate care while he was transported outside of FCI Petersburg. Each of these contentions "calls into question a quintessential professional medical judgment," which "can be resolved *only* by reference to expert opinion testimony." See Parker, 475 F. Supp. 2d at 597 (internal quotation marks and

citation omitted) (concluding that it is not within factfinder's common knowledge what actions prison medical staff should have taken in response to complaints of headaches, when medical staff should have diagnosed plaintiff's condition, and what the proper course of treatment would have been). Johnson's failure to obtain the required certification is thus "fatal" to his FTCA claims and leaves this Court without subject matter jurisdiction to consider them. See James, 143 F. Supp. 3d at 396–97.

Finally, Johnson cannot save his FTCA claims by asking the Court, now, to appoint an expert. The Virginia statute "requires that a party alleging medical malpractice obtain an expert certification of merit *prior to serving process upon defendant.*" Parker, 475 F. Supp. 2d at 596 (emphasis added). Johnson thus erred by waiting until the United States had already been served to seek the appointment of an expert, and appointing one now cannot vest this Court with jurisdiction. Accordingly, Johnson's motion to appoint an expert will be denied.

### III. Summary Judgment

#### A. Bivens Claims

Johnson also seeks to impose Bivens liability on the named defendants for their individual roles in Johnson's treatment at FCI Petersburg. In general, he contends that received constitutionally deficient medical care in three ways: (1) Dr. Rice, Dr. Shah, PA-C Hall, and MLP Katta each denied him access to care; (2) Dr. Akbar, Dr. Laybourn, and Dr. DiCocco ignored and delayed the recommendations made by an outside specialist; and (3) HSA Chatman failed to ensure he would receive his pain medication and walker before being transported to North Carolina. The claims against each individual defendant will be addressed in turn.

#### B. Standard of Review

The Court will grant a motion for summary judgment "if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." Hupp v. Cook, 931 F.3d 307, 317 (4th Cir. 2019) (internal quotation marks and citations omitted).

**C. Analysis**

Under Bivens and its progeny, a prisoner may bring a cause of action for damages under the Eighth Amendment's prohibition against cruel and unusual punishment for deliberate indifference to a serious medical need. Ziglar v. Abbasi, 137 S. Ct. 1843, 1864 (2017); Carlson v. Green, 446 U.S. 14 (1980); Doe v. Meron, 929 F.3d 153, 168 (4th Cir. 2019). To succeed, a plaintiff must first show that he has an objectively serious medical need that has been "diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." See Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) (quoting Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008)). Second, the plaintiff must show that the defendant prison official acted with a "sufficiently culpable state of mind," namely that "the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." See Farmer v. Brennan, 511 U.S. 825, 834, 847 (1994) (internal quotation marks and citation omitted); see also Scinto, 841 F.3d at 225. The defendants' arguments focus exclusively on the state-of-mind requirement.

**i. Dr. Rice, Dr. Shah, PA-C Hall, and MLP Katta**

The defendants argue that Johnson's Bivens claims against Dr. Rice, Dr. Shah, PA-C Hall, and MLP Katta are barred by Virginia's two-year statute of limitations for personal injury claims. See VA. CODE. ANN. § 8.01-243(A); Reinbold v. Evers, 187 F.3d 348, 359 n.10 (4th Cir.

10

1999) (recognizing that courts look to applicable state law to determine statute of limitations in Bivens actions). Johnson filed his Bivens lawsuit on July 19, 2016, so he may generally bring claims only for unlawful activity that occurred after July 19, 2014. The defendants point to undisputed evidence showing that Dr. Rice was transferred from FCI Petersburg in November 2009, and that Dr. Shah retired from the Bureau of Prisons in August 2012. [Dkt. No. 55-1, Banks Decl. ¶ 3]. The defendants also contend that all of Johnson's allegations against PA-C Hall and MLP Katta occurred outside of the statute of limitations.

Johnson counters that his suit is not time-barred because the physicians committed "continuing violations" of his constitutional rights. [Dkt. No. 64, Pl.'s Mem. of Law at 25–28]. A plaintiff may allege a continuing violation by "identifying a series of acts or omissions that demonstrate deliberate indifference to a serious, ongoing medical need," at least one of which occurred within the relevant limitations period. DePaola v. Clarke, 884 F.3d 481, 487 (4th Cir. 2018). In that case, the statute of limitations does not start running until adequate treatment is provided, and the plaintiff's claim "may extend back to the time at which the prison officials first learned of the serious medical need and unreasonably failed to act." Id. Still, when a plaintiff, like Johnson, alleges that numerous medical practitioners continuously acted with deliberate indifference, "in order to be held liable, *each individual defendant* must have committed a constitutional violation within the applicable limitations period." DePaola v. Clarke, —F. Supp. 3d—, No. 7:15cv403, 2019 WL 3548921, at *11 (W.D. Va. Aug. 5, 2019) (emphasis added).

The continuing violation doctrine does not rescue Johnson's untimely claims against Dr. Rice, Dr. Shah, PA-C Hall, and MLP Katta. Neither Dr. Rice nor Dr. Shah could have committed a constitutional violation within the applicable limitations period because the two doctors no longer worked at FCI Petersburg during that time. As for PA-C Hall and MLP Katta, Johnson

attests that "over the years" he would complain to them about his spine pain, but the physicians would tell him only to stretch and drink water. [Dkt. No. 64-2, Johnson Decl. ¶¶ 28–29]. At summary judgment, though, the nonmoving party must present *specific facts* manifesting a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). Even making inferences in the light most favorable to Johnson, he has not identified specific interactions with PA-C Hall or MLP Katta during the limitations period that would allow a rational trier of fact to conclude that the physicians acted with deliberate indifference.[3] Summary judgment in favor of Dr. Rice, Dr. Shah, PA-C Hall, and MLP Katta therefore is warranted.

**ii. Dr. Laybourn**

The defendants contest Johnson's claim that Dr. Laybourn acted with deliberate indifference to his serious medical need. Johnson primarily asserts that Dr. Laybourn should have prescribed pregabalin to treat his nerve pain, because, he declares, gabapentin made him "very ill." [Dkt. No. 64-2, Johnson Decl. ¶¶ 35–36].

Johnson's claim against Dr. Laybourn does not rise to the level of deliberate indifference. Under the Eighth Amendment, "mere disagreements between an inmate and a physician over the inmate's proper medical care are not actionable absent exceptional circumstances." Scinto, 841 F.3d at 225 (internal quotation marks, brackets, and citation omitted). And no exceptional circumstances exist here. Notably, Johnson has not explained what illness or symptoms (other than weight gain) he experienced from taking gabapentin such that a factfinder could conclude

---

[3] Johnson makes the same allegation against Physician Assistant Alejandro Hadded—a named defendant who does not appear to have been served—for the period between November 2005 and spring 2010. [Dkt. No. 1, Pl.'s Verified Compl. ¶ 24]. Even if Hadded had been served properly, Johnson's claims fail against him for the same reasons as for those against PA-C Hall and MLP Katta.

that keeping him on that regime caused "unnecessary and wanton infliction of pain." See Estelle v. Gamble, 429 U.S. 97, 104 (1976). Thus, Johnson's bare assertion is insufficient to block summary judgment in favor of Dr. Laybourn.[4]

### iii. Dr. DiCocco

Johnson faults Dr. DiCocco for delaying his decision to request and prescribe pregabalin from the time he arrived at FCI Petersburg in 2014 as the Clinical Director up until April 11, 2016. [Dkt. No. 64, Pl.'s Mem. of Law at 35–36]. He avers that he would wait outside the health services unit or mess hall until Dr. DiCocco passed by to "tell him about all my difficulty with pain and numbness and request that he prescribe medication or do something to fix the bulging disc in my neck." [Dkt. No. 64-2, Johnson Decl. ¶ 38]. Johnson declares that Dr. DiCocco would respond by telling him that "he did not do curb-side consultations" [Id.].

The undisputed evidence shows that no rational factfinder could conclude that Dr. DiCocco was deliberately indifferent to Johnson's pain. First, as with Dr. Laybourn, Johnson's disagreement with Dr. DiCocco over which specific medicine to prescribe is not actionable under the Eighth Amendment. See Scinto, 841 F.3d at 225. Second, a prison doctor does not act with deliberate indifference by requiring an inmate to seek medical care using the prison's established processes. See Jackson v. Wiley, 352 F. Supp. 2d 666, 678 (E.D. Va. 2004) (rejecting Bivens claim against assistant warden who required inmate to follow prison protocol for obtaining medical care). Accordingly, the Court will grant summary judgment for Dr. DiCocco.

### iv. HSA Chatman

Johnson's Eighth Amendment claim against HSA Chatman relates to her alleged role in

---

[4] Johnson also faults Physician Assistant Hadded for failing to prescribe pregabalin. [Dkt. No. 1, Pl.'s Verified Compl. ¶ 66]. This claim fails for the same reason it does against Dr. Laybourn.

preparing Johnson for his transport to FMC Butner. (Dkt. No. 64-2, Johnson Decl. ¶¶ 30, 32–33). Johnson avers that Chatman failed to follow through with her assurance that he would be given his pain medication and walker before he embarked on the journey. (Dkt. No. 1, Pl.'s Verified Compl. ¶ 66; Dkt. No. 64, Pl.'s Mem. of Law at 31–33). Chatman declares that she does not recall being involved in preparing Johnson for the trip. (Dkt. No. 55-14, Chatman Decl. ¶ 8). She adds that "[a] review of his medical records indicates that on June 8, 2016, [Johnson] was issued a 4 wheel walker," and she is "aware that with regard to the July 29, 2016 medical trip, his medications were stopped by his treating physicians prior to the medical trip, and were restarted upon his return to the institution," but that she "was not involved in any way in those treatment decisions." (Id.)

Even if the Court were to credit Johnson's declaration, HSA Chatman's alleged actions would not rise to the level of an Eighth Amendment violation. Prison medical personnel do not act with deliberate indifference by inadequately preparing an inmate for transportation, especially when, as here, the purpose of the trip is to receive medical care. See Anderson v. Kingsley, 877 F.3d 539, 543 (4th Cir. 2017) ("Eighth Amendment liability 'must involve more than ordinary lack of due care for the prisoner's interests or safety. . . . It is *obduracy and wantonness, not inadvertence or error in good faith*, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause.'" ) (quoting Wilson v. Seiter, 501 U.S. 294, 299 (1991)). At most, this kind of alleged omission would amount to negligence or malpractice, which are not actionable under the Eighth Amendment. See Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014).

**v. Dr. Akbar**

It does not appear that Dr. Akbar was ever served. But to the extent he is a proper

defendant in this suit, the claims against him must be dismissed given that the undisputed evidence demonstrates that he was not employed by the federal government, but rather, as a contractor. Neither the Supreme Court nor the Fourth Circuit has recognized that private individuals—even those closely tied to the government—can be sued under Bivens. See Minneci v. Pollard, 565 U.S. 118, 131 (2012); Holly v. Scott, 434 F.3d 287, 291–94 (4th Cir. 2006); Gilbert v. ATF, 306 F. Supp. 3d 776, 788 (D. Md. 2018). Moreover, the Supreme Court has strongly cautioned against extending the Bivens remedy. See Ziglar, 137 S. Ct. at 1857–58. Accordingly, Johnson may not bring a Bivens claim against Dr. Akbar.

**IV. Conclusion**

For the reasons outlined above, the defendants' motion to dismiss and for summary judgment [Dkt. No. 54] will be granted through an Order that will issue alongside this Memorandum Opinion.[5]

Entered this 24th day of Sept. 2019.

/s/ Claude M. Hilton
United States District Judge

Alexandria, Virginia

---

[5] Additionally, Johnson moves the Court to appoint counsel, but only "[i]f the Court determines that this case should proceed further" because some of the inmates who have been helping him with typing and legal research "may be transferring to other institutions or getting released." [Dkt. No 62]. The Court is granting the defendants' motion to dismiss and for summary judgment, and so the Court will also deny Johnson's motion for appointment of counsel.

15